# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LESLIE ANDERSON, )
)
           Petitioner, )
)
v. )    **CASE NO. 10-CV-912-WDS**
)
UNITED STATES of AMERICA, )    **CRIMINAL NO. 04-CR-30111-WDS-3**
)
           Respondent. )

## MEMORANDUM & ORDER

**STIEHL, District Judge:**

Before the Court is petitioner's pro se motion to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255 (Doc. 1), to which the government filed a response (Doc. 4), and petitioner filed replies (Docs. 7, 8). Petitioner has also filed a motion to supplement (Doc. 13), which this Court has construed as a motion to amend, and a second motion to amend (Doc. 14),[1] to which the government has not responded.[2]

### BACKGROUND

Petitioner was involved with a fraudulent telemarketing scheme based in Canada. The Superseding Indictment against petitioner consisted of twenty-four (24) charges: one count of conspiracy in violation of 18 U.S.C. § 371, five counts of mail fraud in violation of 18 U.S.C. § 1341, and eighteen counts of wire fraud in violation of 18 U.S.C. § 1343. On March 20, 2008, after a five day trial, petitioner's motion for judgment of acquittal was denied, and petitioner was convicted by a jury of all twenty-four (24) counts charged.

Petitioner raised various objections to the sentencing enhancements recommended.

---

[1] The Clerk of the Court is **DIRECTED** to file the documents submitted by petitioner with respect to his second motion to amend (Doc. 14).

[2] This court has liberally construed petitioner's pro se pleadings. *See Smith v. Grams*, 565 F.3d 1037, 1041-42 (7th Cir. 2009); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

The Court applied all but two of the recommended enhancements. Specifically, the Court applied:

> A twenty-level enhancement because the total loss resulting from the fraud was $8,273,893.50; a six-level increase because the fraud involved more than 250 victims; a two-level enhancement because the fraud targeted vulnerable victims; a two-level enhancement because a substantial part of the offense was committed outside the United States; a three-level enhancement based on Mr. Anderson's status as a manager or supervisor of the scheme; and a two-level enhancement for obstruction of justice. As a result, Mr. Anderson's adjusted offense level was 42, and the Guidelines recommended a sentencing range of 360 months to life imprisonment.

*United States v. Anderson*, 580 F.3d 639, 645 (7th Cir. 2009). On July 29, 2008, petitioner was sentenced to a below-guidelines sentence of 280 months of imprisonment.

Petitioner filed a direct appeal challenging his conviction and his sentence. *See Anderson*, 580 F.3d 639. On appeal, petitioner argued that the evidence presented at trial was insufficient to prove that he possessed the knowledge or intent necessary to be guilty as charged, and challenged his sentence on the bases that the court improperly applied a two-level enhancement for obstruction of justice, improperly applied a three-level enhancement for petitioner's role as a manager or supervisor, and that the sentence imposed by the court was unreasonable. *See id.* Petitioner's conviction and sentence were affirmed. *Id.* at 653.

The Court of Appeals, in its opinion, provided an extensive summary of the evidence produced by the government at trial. Rather than repeating it, in its entirety, the Court hereby incorporates it by reference. *Id*. at 641-645. The most pertinent sections for the purposes of this Order, however, are included *infra*.

**1. The Creation of First Capital**

Mr. Anderson, a Canadian citizen, became acquainted with David Dalglish through Mr. Anderson's Toronto-based home improvement business. Dalglish helped Mr. Anderson secure a lucrative contract with the city of Toronto, and Mr. Anderson, in return, loaned Dalglish a large sum of money so that Dalglish could open up a telemarketing business with his friend, Lloyd Prudenza. That business ultimately became known as First Capital.

. . . .

In 2001, Lennox, Dalglish and Mr. Anderson met to discuss First Capital's business model. Lennox explained to Dalglish and Mr. Anderson that First Capital would hold itself out as a "credit recovery business" that sold "benefits packages" to consumers. These benefits packages included coupons, brochures, a credit-repair guide and a "stored-value card." The stored-value card bore a MasterCard logo, but it was not a credit card because it had no independent purchasing power. Instead, before making a purchase, a user first was required to credit funds to the stored-value card. The user's purchasing power was limited to the amount of funds he had credited to the card in advance of the purchase. Lennox explained that the stored-value cards were the most important part of First Capital's benefits packages because they allowed First Capital's salespersons to tell its customers that they would receive a MasterCard with their benefits packages. The customers would then assume that they would be receiving credit cards that permitted them to make purchases that could be paid for later, either by a single payment or by a payment plan.

    . . . .

After that first meeting, Mr. Anderson wrote a letter to the Mill Haven Penal Institution, where Prudenza was serving a sentence for conspiracy to commit fraud, in order to facilitate Prudenza's early release on parole. Prudenza testified that, as part of his application for parole, he was required to "establish a game plan for [his] release." R.198 at 29. Mr. Anderson "provided [him] with a letter of employment to fit that game plan." *Id*. Shortly after Prudenza's release, he, Dalglish and Mr. Anderson met at Mr. Anderson's office. Prudenza brought his fiancee, Lesley McCloud, to the meeting, but she left after Mr. Anderson complained about her presence. Later, Mr. Anderson explained to Prudenza that "he didn't want women around when we're talking about things that ... are illegal .... Because they would turn around and would rat on the situation." *Id*. at 32–33.

Prudenza testified that, at the meeting, he and Mr. Anderson discussed his incarceration and his criminal offense; he claimed that Mr. Anderson "knew ... what [he had] been in jail for," and explained that his telemarketing experience and criminal conviction were an "enticement to bringing [him] aboard." R.199 at 49, 50. Prudenza further testified that everyone at the meeting, including Mr. Anderson, understood that they did not have, and could not obtain, authorization to sell any type of MasterCard. He noted that, at the meeting, Mr. Anderson reviewed a sample "sales script" and described the script as a "good gaff" and a "good con." R.198 at 35, 39. In addition, Prudenza claimed that he discussed the possibility of police intervention with Mr. Anderson, telling him that they had to do things "in a certain way to avoid being caught right away." *Id*. at 37–38.

Later, after First Capital had begun preliminary operations, Lennox,

Dalglish, Prudenza and Mr. Anderson met to discuss the sales scripts for telemarketers and verifiers. Lennox testified that he went over the scripts while Mr. Anderson was present. He testified that the scripts were intended to deceive First Capital's customers by convincing them that they would receive a credit card from a major bank in exchange for a fee.

## 2. First Capital's Business Operations

First Capital hired hundreds of telemarketing sales representatives who placed telephone calls from Toronto to United States residents with poor credit histories. The representatives, using First Capital's sales scripts, would suggest that First Capital could help its customers obtain credit cards in exchange for a fee.

. . . .

After receiving the customer's authorization and account information, the verifier would cause funds to be transferred out of the customer's bank account through an automated clearing house ("ACH").

. . . .

At the height of its operations, First Capital had 250 employees. Lennox estimated that First Capital placed at least 10,000 telemarketing calls each week, resulting in about 500 successful sales per week. Over the course of its operation, First Capital defrauded approximately 40,000 victims out of more than $8 million.

## 3. Mr. Anderson's Role in First Capital

The Government presented evidence that Mr. Anderson held a position of authority in First Capital. Specifically, it introduced evidence of a September 2001 meeting at Toronto Dominion Bank, where Mr. Anderson introduced Dalglish to Gary Shaswell, the bank manager. Together, they set up a business account for First Capital. During that meeting, Dalglish submitted a copy of First Capital's articles of incorporation; Mr. Anderson's name was listed on the articles as a director of the company. Dalglish also told Shaswell that Mr. Anderson was the president of the company. Although Mr. Anderson later claimed to have been surprised by Dalglish's statement and denied agreeing to serve as First Capital's president, he did not object to or correct any of Dalglish's representations to Shaswell. During the meeting, Mr. Anderson signed a number of documents which named him as a principal of the corporation, president of First Capital and a signatory on First Capital's account. R.199 at 152–55; R.200 at 34–41.

The Government also presented evidence that, in addition to being listed as president and principal, Mr. Anderson was considered a partner in First Capital; Mr. Anderson, Dalglish and Prudenza agreed that, after Mr.

Anderson's initial loan to the company was repaid, they would divide First Capital's remaining profits between themselves. Prudenza testified that, during one meeting, he, Dalglish and Mr. Anderson each received a $400,000 share of First Capital's $1.2 million profit.

Prudenza testified that Mr. Anderson's role in First Capital was primarily financial, as opposed to managerial. Mr. Anderson provided the startup funds for First Capital and handled First Capital's finances. He signed invoices and authorized payments for leads lists and benefits packages. R.197 at 35–39. In addition, several documents recording wire transfers made on First Capital's behalf bore Mr. Anderson's signature, although Mr. Anderson did not recall signing the documents. R.199 at 157.

Mr. Anderson's contributions to First Capital were not solely financial, however. For example, Mr. Anderson regularly met with Prudenza to discuss First Capital's operations, and he attended at least two managers' meetings where First Capital's sales pitch, verification problems and sales issues were discussed. Mr. Anderson also admitted that he had performed work on First Capital's offices, leased vehicles to First Capital and provided cell phones to Dalglish, Prudenza and two others. R.199 at 166; R.200 at 4–5. Furthermore, in August or September 2002, Mr. Anderson was left in charge of First Capital and oversaw all of the company's operations while Prudenza and Dalglish were vacationing in Italy. During that time period, Mr. Anderson signed payroll checks and authorized wire transactions for leads-list purchases.

The Government also introduced evidence pertaining to whether Mr. Anderson knew of the illegal nature of First Capital's activities. For example, Prudenza testified that Mr. Anderson took an active interest in First Capital's sales and "knew overall of what was going on" at First Capital. R.198 at 49–51, 54. According to Prudenza, Mr. Anderson knew that First Capital was misleading its customers: Prudenza testified that, after the sales scripts were discussed during his first meeting with Mr. Anderson, Mr. Anderson asked, "Are Americans that stupid?" R.198 at 37. Prudenza also stated that he had informed Mr. Anderson of the complaints from the ACH companies and that he specifically had informed Mr. Anderson that First Capital had received complaints from customers who either had not received their credit repair packages or had not received what they had been promised. In addition, Stephen Simpson, one of Mr. Anderson's employees, testified that Mr. Anderson showed him a $400,000 check dated September 20, 2002. According to Simpson, Mr. Anderson "kissed [the check], put it in his pocket and he said, 'Thank God for stupid Americans.' " R.199 at 87.

580 F.3d at 641-645 (footnotes omitted).

In his § 2255 motion, petitioner raises seven grounds for relief based on ineffective

assistance of trial and appellate counsel, including, failure to (1) notify the Court that petitioner was disadvantaged by the decision in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006); (2) object to the Court's consideration of erroneous numbers in the PSR; (3) contest petitioner's responsibility for loss; (4) ask the sentencing Court to consider petitioner's placement in harsh conditions pre-sentencing; (5) request a downward variance in sentencing based on petitioner's status as an alien; (6) object to the Court's use of a vulnerable victims enhancement; and (7) bring to the Court's attention several mitigating circumstances in support of a lesser sentence.

Although the government concedes, and this Court agrees that petitioner's initial motion was timely, petitioner has also filed two motions to amend, which were filed after the government had filed its response and outside of § 2255's one-year time limit. *See* 28 U.S.C. § 2255(f).

Petitioner's first motion to amend[3] (Doc. 13), contains an additional ineffective assistance of counsel claim, asserting that trial counsel failed to effectively explain the plea offer made by the government and its consequences. In his second motion to amend (Doc. 14), petitioner alleges that: (1) the government's witnesses, specifically Lennox and Prudenza, engaged in wrongdoing by presenting false evidence in violation of the due process clause; (2) trial counsel failed to introduce exculpatory evidence, specifically Dalglish's letters and comments on the government witnesses, to vindicate petitioner; and (3) Dalglish's written testimony vindicates petitioner by proving Lennox and Prudenza gave false testimony.

## LEGAL STANDARD

Relief under § 2255 is "reserved for extraordinary situations." *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 633-

---

[3] This document lacks a title or caption, but includes an eighth ground for relief on the basis of ineffective assistance of counsel. The document was docketed as a "supplement" but the Court construes it, based on its substance, as a motion to amend.

6

34 (1993)).  Section 2255 requires the court to vacate, set aside, or correct the sentence of a prisoner in custody if the Court finds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).

A § 2255 motion "can *not* raise (1) issues that were raised on direct appeal, absent a showing of changed circumstances; (2) nonconstitutional issues that could have been but were not raised on direct appeal; and (3) constitutional issues that were not raised on direct appeal, *unless* the section 2255 petitioner demonstrates cause for the procedural default as well as actual prejudice from the failure to appeal."  *Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992), *overruled on other grounds by Castellanos v. United States*, 26 F.3d 717 (7th Cir. 1994).  Section 2255 is "neither a recapitulation of nor a substitute for a direct appeal."  *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995).  Thus:

> [a]n issue not raised on direct appeal is barred from collateral review absent a showing of both good *cause* from the failure to raise the claims on direct appeal and actual *prejudice* from the failure to raise those claims, or if a refusal to consider the issue would lead to a fundamental miscarriage of justice.

*Prewitt*, 83 F.3d at 816 (emphasis in original).

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Ineffective assistance of counsel claims, however, have been identified as generally raised and considered on collateral review, where a complete record can be developed.  *Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Harris*, 394 F.3d 543, 557-58 (7th Cir. 2005).  A court's review of an attorney's performance is highly deferential.  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  The petitioner, therefore, bears a heavy

burden to establish ineffective assistance of counsel. *United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 1995).

Ineffective assistance claims are evaluated under the two-prong *Strickland* test. *McDowell v. Kingston*, 497 F.3d 757, 761 (7th Cir. 2007) (citing *Strickland v. Washington*, 466 U.S. 688, 690, 694 (1984)). To succeed, the petitioner must establish that (1) counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant in such a way that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 695. The Court is not required to analyze both the performance and prejudice prong, because the failure to satisfy either prong is fatal to the claim. *Ebbole v. United States*, 8 F.3d 530, 533 (7th Cir. 1993); *United States v. Slaughter*, 900 F.2d 1119, 1124 (7th Cir. 1990).

The proper standard for reviewing counsel's performance is that of "reasonably effective assistance," which means the petitioner, to prevail, must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. To show that counsel's performance fell below an objective standard of reasonableness, a petitioner must identify "acts or omissions of counsel that could not be the result of professional judgment. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (internal quotations omitted). Moreover, counsel's performance must be evaluated considering all the circumstances, "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

To meet the prejudice prong, a petitioner need only show a reasonable probability that counsel's conduct altered the outcome, or, in other words, a probability sufficient to undermine confidence in the outcome. *McElvaney v. Pollard*, --- F.3d ---, No. 12-2357, 2013 WL 4423669, at *5 (7th Cir. Aug. 20, 2013).

## II. AMENDMENTS TO CLAIMS PURSUANT TO 28 U.S.C. § 2255

"A district court may properly deny a motion to amend as futile if the proposed amendment would be barred by the statute of limitations." *Rodriguez v. United States*, 286 F.3d 972, 980 (7th Cir. 2002) (noting that amendments may also be denied, in the court's discretion, under Fed.R.Civ.P. 15 based on undue delay, bad faith, dilatory motive, or prejudice). "An amended habeas petition, . . . , does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005); *see also, Rodriguez*, 286 F.3d at 981 (the Seventh Circuit has noted (without indicating disapproval), rulings in other circuits which have determined that untimely claims which attempt to bring entirely new theories or claims for relief are barred, and that an untimely claim does not "relate back" merely on the basis that it arose out of the same trial or sentencing proceeding as the timely claims.).

Once the one-year time limit has expired, the statute can be tolled by an amendment that relates back to the original, timely filing. *Rodriguez*, 286 F.3d at 981. More specifically, in accordance with Fed. R. Civ. P. 15(c), "an amended complaint relates back to the date of the original complaint for purposes of tolling the statute of limitations where 'the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occur-

rence set forth or attempted to be set forth in the original pleading.'" *Id*. (quoting Fed. R. Civ. P. 15(c)(2)).

The Court will first determine whether the claims included in the motions to amend relate back to the original petition and will be considered on the merits, and then proceed to the merits of all remaining claims.

**ANALYSIS**

**I. MOTIONS TO AMEND**

**A. FIRST MOTION TO AMEND (DOC. 13)**

The statute of limitations requires that a § 2255 motion be filed within one year of "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). When a defendant chooses not to pursue his appeal beyond the Court of Appeals, the one-year period is measured from the end of the time for filing a petition for certiorari in the Supreme Court. *See Clay v. United States,* 537 U.S. 522, 525 (2003) ("For the purpose of starting the clock on § 2255's one-year limitation period, we hold, a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction.")

In this case, the time in which petitioner could have petitioned for a writ of certiorari expired in December, 2009. Therefore, the deadline for filing his § 2255 motion was December, 2010. Petitioner filed his original § 2255 motion on November 12, 2010, within the one-year statute of limitations for such motions. Petitioner's first motion to amend, however, was filed on December 21, 2012, approximately two years outside of the time limit. Based on the untimeliness of the motion to amend (Doc. 13), it will be denied unless the claim therein relates back to the claims filed in the timely petition (Doc. 1).

Petitioner's motion to amend includes an eighth ground for relief based on ineffec-

10

tive assistance of counsel before trial, during plea negotiations. Specifically, petitioner asserts that counsel failed to adequately explain the plea offer made to him, and he was, therefore, deprived of making an intelligent choice regarding whether to plead guilty or proceed to trial. Petitioner's original petition is based on seven (7) claims of ineffective assistance of counsel, none of which mentioned a plea offer, pre-trial negotiations, or any pre-trial proceedings, but solely focuses on the sentencing and appeal proceedings.

The claim contained in the untimely motion, is entirely different in both time and type from the timely claims set forth in the original pleading, and therefore, this claim would be barred by the statute of limitations. Notably, the Court can find no reason (and petitioner provides none) why petitioner would not have been able to raise this claim in his initial, timely, petition. Accordingly, the Court **DENIES** petitioner's motion to amend (Doc. 13) as futile.

### B. SECOND MOTION TO AMEND (DOC. 14)

On June 7, 2013, petitioner filed a second motion to amend (Doc.14), alleging three (3) claims: (1) that the government's witnesses, specifically Lennox and Prudenza, engaged in wrongdoing by presenting false evidence in violation of the due process clause; (2) that trial counsel failed to introduce exculpatory evidence, specifically, Dalglish's letters and comments on the government witnesses, to vindicate petitioner; and (3) that Dalglish's written testimony vindicates petitioner by proving Lennox and Prudenza gave false testimony. Petitioner's second motion to amend was filed on June 7, 2013, approximately two and a half (2.5) years beyond the time limit. Based on the untimeliness of the motion to amend (Doc. 14), it will be denied unless the claims therein relate back to the claims filed in the timely petition (Doc. 1).

Petitioner's timely motion raises claims of ineffective assistance entirely based on

alleged failures with respect to sentencing and appeal. The claims raised in the second mo-

tion to amend relate to testimony produced at trial, the failure of petitioner's counsel to pro-

duce certain evidence at trial, and certain "new" evidence which allegedly vindicates peti-

tioner. The claims contained in this untimely motion, are entirely different in both time and

type from the timely claims set forth in the original pleading, and therefore, these claims

would be barred by the statute of limitations. To the extent that these claims are based upon

facts and evidence available before or during petitioner's criminal proceedings, the Court

can find no reason (and petitioner provides none) why petitioner would not have been able

to raise these claims in his initial, timely, petition. Accordingly, the Court **DENIES** those

portions of petitioner's motion to amend (Doc. 14) as futile.

      Petitioner also largely bases these claims upon evidence that he alleges he was only

recently able to obtain, and which he claims is "new evidence" that vindicates him. For a

petitioner to bring an allegation pursuant to § 2255, he must allege that "the sentence was

imposed in violation of the Constitution or laws of the United States, or that the court was

without jurisdiction to impose such sentence, or that the sentence was in excess of the max-

imum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

The claims petitioner lists in his second motion to amend do not allege that the district court

was without jurisdiction to impose the sentence, or that the sentence was in excess of the

maximum authorized by the law. Petitioner is claiming that newly discovered evidence vin-

dicates him and refutes testimony produced against him at trial. He does make a one-

sentence reference to due process, "[b]ut a conviction does not violate the Constitution nor

become otherwise subject to collateral attack merely because newly discovered evidence

may be helpful to a defendant." *Mankarious v. United States*, 282 F.3d 940, 945 (7th Cir.

2002); *see also, United States v. Evans,* 224 F.3d 670, 674 (7th Cir.2000).

      Petitioner should have brought these claims pursuant to Rule 33 of the Federal Rules

of Criminal Procedure. Under Rule 33, "a district court may grant a new trial on the basis of newly discovered evidence within three (3) years of the verdict or finding of guilt." *Mankarious*, 282 F.3d at 945. Petitioner filed his second motion to amend on June 7, 2013, well after the three-year time limit of March, 2011 for a Rule 33 motion. Further, petitioner "may not use § 2255 to circumvent Rule 33's time limit." *Id. See also, Guinan v. U.S.*, 6 F.3d 468, 470 (7th Cir. 1993). Accordingly, petitioner's second motion to amend is **DE-NIED**.

As a result of these rulings, the only remaining claims for the Court to consider are those contained in petitioner's initial motion (Docs. 1, 2).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A. FAILURE TO NOTIFY COURT OF SENTENCING DISPARITY

Petitioner claims that trial counsel failed to notify the Court that petitioner was disadvantaged by the decision in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), which required the Court to use current sentencing guidelines which contained enhancements, even though the criminal act was committed before the enhancements were added to the guidelines.[4] Under *Demaree*, use of "the current version of the guidelines does not raise an ex post facto concern even if the result is a greater imprisonment range for the charged offense." *United States v. Rabiu*, 721 F.3d 467, 470 (7th Cir. 2013). Petitioner claims that, based on *Demaree*, his guidelines range was ninety-eight (98) months higher at the low end than it would have been in any other district in the country.

Petitioner's counsel did, in fact, object to his being sentenced pursuant to the then-current sentencing guidelines instead of those in effect at the time of the offense, arguing that it would violate the ex post facto clause (No. 04-CR-30111-WDS-3, Doc. 149 at 3).

_____

[4] The Court notes that *Demaree* has recently been abrogated by the Supreme Court in *Peugh v. United States*, 133 S.Ct. 2072 (2013). As noted by the Northern District of Illinois, however, *Peugh* was not made retroactively applicable to cases on collateral review. *United States v. Osborn*, No. 13 C 50224, 2013 WL 3795700, at *1 (N.D. Ill. July 19, 2013).

Petitioner's counsel again raised a disparity argument in her sentencing memorandum urging the Court to consider the following: sentencing disparity amongst petitioner's co-defendants; sentencing disparity amongst defendants involved in other international telemarketing fraud cases in other districts; and the United States Sentencing Commission's *Sourcebook of Federal Sentencing Statistics*, which reported average length of imprisonment for economic offenses including frauds over a number of years, from 2002 until 2007 (No. 04-CR-30111-WDS-3, Doc. 158 at 6,7).

Petitioner's counsel noted the government's reference to petitioner as the potential "international poster child on mass marketing fraud," who may receive "the longest sentence of imprisonment of any telemarketer EVER," (No. 04-CR-30111-WDS-3, Doc. 158 at 6), using this comment to argue that the government essentially conceded to petitioner's sentencing disparity, and argued that based on the facts of petitioner's case, such a sentence would be "Draconian," and a "miscarriage of justice." (No. 04-CR-30111-WDS-3, Doc. 158 at 6).

Upon review of the record, petitioner's counsel submitted a written objection that was sufficient to alert the Court and pose a challenge to the calculation of petitioner's sentence in accordance with the guidelines in effect at the time of sentencing instead of those in effect at the time of his unlawful conduct, alerted the Court to the disparity amongst petitioner and his co-defendants, alerted the Court that the government had stated that petitioner was facing one of the longest sentences of all defendants, internationally, who had committed similar crimes, alerted the Court to the lower sentences imposed upon defendants convicted of similar charges in other districts, and  provided the Court with statistics from the United States Sentencing Commission regarding the average length of imprisonment for fraud offenses over the course of the five previous years.  Counsel faced an uphill battle

with respect to the *Demaree* case, in that it was Circuit precedent at the time,[5] but counsel provided the Court with a number of other sources to consider on the sentencing disparity issue. Moreover, an assertion that petitioner's sentence is disparate to those nationwide, or to other districts, is very similar to the venue-based argument that could be made strictly based on *Demaree.* Petitioner has failed to show that counsel's assistance fell below an objective standard of reasonableness.[6]

On appeal, petitioner's counsel raised the argument that "there is an unjustifiable disparity between his sentence and the sentences of his coconspirators." 580 F.3d at 651. The Court of Appeals determined that this claim failed because an asserted discrepancy between a defendant and his codefendants is not a sufficient basis to challenge the sentence, "unless the defendant can show that the sentence imposed creates a disparity between the length of his sentence and all other similar sentences imposed *nationwide.*" *Id*. at 651-52 (internal quotation omitted). Petitioner's appellate counsel directed the court's attention to cases, assertedly similar to petitioner's, in which defendants received disproportionately shorter sentences. *Id*. at 652. The Court of Appeals determined, however, that "the disparity in sentencing reflects legitimate factual differences between Mr. Anderson's case and those on which he relies," namely, the type of fraud involved, the guidelines in effect, the vastly lower number of victims, and the commission of the crime within the United States instead of abroad. *Id.* As noted by the Court of Appeals, those established facts greatly impacted petitioner's sentencing range, distinguished him from the other cases cited, and, as a result, "no *unwarranted* disparity between Mr. Anderson's sentence and the sentences of

---

[5] Notably, the Seventh Circuit has recently found no error with a sentence imposed pursuant to the guidelines manual in effect at the time of sentencing, noting the fact that this practice was consistent with then-existing circuit precedent. *United States v. Stokes*, 726 F.3d 880, 898 (7th Cir. 2013).

[6] The sentence petitioner received was within the guidelines range that he claims his attorney should have argued for more vigorously. Specifically, petitioner states that his guidelines range should have been 262-365 months. Petitioner was sentenced to 280 months, a sentence within this range, and below the range determined pursuant to *Demaree*, which was 360 months to life.

similarly situated defendants nationwide" exists.  *Id.*

The Court of Appeals made clear that the specific characteristics of petitioner's crime led to his sentence, and that there was no *unwarranted* disparity.  In light of this determination, petitioner cannot show that he was prejudiced by counsel's failure to raise a venue-based disparity argument.  Accordingly, petitioner's claim, on this basis, is **DENIED**.

## B. FAILED TO OBJECT TO ERRONEOUS CALCULATION IN PSR

Petitioner claims that trial counsel failed to object to the Court's consideration of erroneous numbers in the pre-sentencing report, which led the Court to consider an inaccurate "net proceeds" total, and resulted in a two-level increase in the base offense level. Petitioner claims that counsel failed to recognize the Court's computation of actual loss in excess of $7 million was clearly erroneous given the government's concession of its inability to prove "total gross transactions" in excess of $20 million, and that counsel acquiesced because of the figure determined at a co-defendant's sentencing on the day before petitioner's. Petitioner also asserts that counsel failed to provide the Court with information in her possession that was more accurate and reliable than the information the Court had before it, namely, his own bank records, which he indicates provided a full record of all of the funds received by First Capital from the inception of the business, and showed a loss of less than $7 million.   Petitioner also claims that appellate counsel failed to raise this issue on appeal.

Petitioner believes that, but for counsels' errors, he would have been sentenced at a base level of 40 instead of 42, yielding a guidelines range of 292-365 months, instead of 360-life.  He asserts that, with the downward variance he received, his sentence would have been 228 months.

The government asserts that petitioner's counsel successfully objected to the amount of loss being in excess of $20 million, and that petitioner neither objected then, nor does he object now, to the finding in the PSR that a civil judgment had been entered against him and his coconspirators, and in favor of the Federal Trade Commission in the amount of

$8,273,893.50, the precise amount that the Court determined to be the actual loss for the purposes of the sentencing guidelines. The government further asserts that this particular telemarketing scheme operated under a number of different names (as listed in the Indictment), that "First Capital" was only one of those, and that, therefore, petitioner's records would have been incomplete. According to the government, petitioner's counsel acted reasonably in the face of the civil judgment against the petitioner, as well as the lack of sufficient credible evidence to justify an argument that the loss was less than $7 million.

Upon review of the record, petitioner's trial counsel did successfully object to the original finding in the PSR that the amount of loss was over $20 million. Petitioner's counsel specifically objected to the twenty-two (22) level enhancement based on the initial amount of loss in excess of $20 million, arguing that the amount was never presented to a jury, that petitioner's involvement was limited, and that he should not be held accountable for the intended or actual loss because neither was foreseeable by him. Petitioner's trial counsel did not object to the determination in the PSR that a civil judgment was entered against petitioner in the amount of $8,273,893.50, nor does petitioner dispute this fact now. He simply claims that the figure is inaccurate.

Petitioner's counsel's assistance did not fall below an objective standard of reasonableness with respect to her objections to the total loss calculation. Counsel objected to the total loss amount and successfully obtained a reduction from the original $20-plus million figure to $8 million. Petitioner's counsel did not act unreasonably by further disputing the loss amount in the face of the civil judgment obtained by the FTC against the petitioner in precisely the amount that was ultimately determined to constitute the loss in this case. Additionally, petitioner can not show that counsel's performance fell below an objective standard of reasonableness by failing to present to the Court incomplete records that petitioner had provided her, which only represented amounts received by the scheme under one of its many names. For the same reasons, appellate counsel did not perform in an objectively un-

17

reasonable manner by failing to raise this issue on appeal.  Petitioner's claims, on these bases, are **DENIED**.

### C. FAILURE TO CONTEST PETITIONER'S RESPONSIBILITY FOR LOSS

Petitioner next claims that trial counsel failed to contest petitioner's responsibility for actual loss that accrued prior to petitioner's joining the conspiracy, as well as his responsibility for losses that accrued outside the scope of the conspiracy. Petitioner also argues that his appellate counsel failed to raise petitioner's responsibility for the entire "actual loss."

Upon review of the record, however, it appears that both trial and appellate counsel did challenge petitioner's responsibility and argued he was only responsible for part of the loss, his culpability in the scheme was limited, and that he could not have reasonably foreseen the entire amount of loss accrued. (*See* No. 04-CR-30111-WDS-3, Doc. 149 at 9;  Doc. 158 at 7; Doc. 4-4).  In the objections to the PSR, counsel specifically argued that "Anderson is responsible for only part of the loss; He was not involved in all of his co- conspirators efforts to defraud consumers, causing the loss figure to overstate his culpability."  (No. 04-CR-30111-WDS-3, Doc. 149 at 9).

Appellate counsel argued that petitioner was duped, that his involvement was minor and tangential, and that the evidence was insufficient for a reasonable jury to find beyond a reasonable doubt that he had the requisite knowledge and intent to commit fraud.  (Doc. 4-4 at 6).  Counsel's argument specifically focused on the lack of evidence showing petitioner's knowledge and intent, claiming that the government could point to no evidence that petitioner was involved in formulating business plans, developing lead lists, drafting scripts, supervising employees, making telemarketing calls, or handling customer complaints.  *Id.* at 9.  Counsel also argued that the collective evidence did not show that petitioner "was ever told, realized, or turned a blind eye to the fraud being committed by others at First Capital." *Id*. at 10.  Further, counsel asserted that none of Prudenza's testimony regarding petitioner's

18

presence at meetings showed that petitioner "knew (or should have suspected) that consumers were being promised credit cards and then ripped off by First Capital." *Id.* at 12.

It appears that appellate counsel argued petitioner's responsibility for the loss in a way that could potentially reverse his conviction, instead of merely resulting in a lower sentence. It was not unreasonable for petitioner's counsel to pursue this avenue instead of challenging petitioner's responsibility for loss, as determined at sentencing. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *McNary v. Lemke*, 708 F.3d 905, 920 (7th Cir. 2013) ("In sum, we do not second-guess informed strategic choices." (internal quotation omitted)). Furthermore, "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Despite appellate counsel's thorough arguments pointing to specific trial evidence, as well as his assertions that specific evidence was lacking, the Court of Appeals ultimately determined that the trial evidence adequately supported petitioner's conviction. 580 F.3d at 647-48.

In light of the efforts noted above by both trial and appellate counsel, petitioner fails to show that their assistance fell below an objective standard of reasonableness. Petitioner's claims, on this basis, are **DENIED**.

### D. FAILURE TO ASK THE SENTENCING COURT TO CONSIDER PETITIONER'S PLACEMENT IN HARSH CONDITIONS

Petitioner argues that trial counsel failed to ask the Court to consider petitioner's placement in harsh conditions of confinement while detained in the "Don" jail in Toronto for over 27 months pending extradition. He believes that this consideration may have resulted in a lighter sentence. He further argues that appellate counsel also failed to raise this issue on appeal. Petitioner cites *United States v. Turner*, 569 F.3d 637, 642 (7th Cir. 2009), to argue that '[d]ecisions in the Seventh Circuit have recognized that pre-trial conditions of

19

confinement, when 'unusually harsh' and 'truly egregious' may justify a reduced sentence." (Doc. 2 at 29). The Court in *Turner*, however, references the case of *United States. v. Ramirez-Gutierrez*, 503 F.3d 643 (7th Cir. 2007), which discusses two pre-*Booker* cases from the Second and Eleventh Circuits that found pre-sentencing conditions so egregious that reduced sentencing was in order. *See Turner*, 569 F.3d at 642.

The Court in *Turner*, notes, "[o]ur prior decisions make clear that conditions of presentencing confinement are not considered as part of the § 3553(a) factors" and "we have not determined where 'extraordinarily harsh conditions of confinement' could justify a reduced sentence." *Id*.; *see also, United States v. Macias-Martinez*, 344 F.App'x 264, 266 (7th Cir. 2009) ("[C]onditions of presentencing confinement are not among the factors that judges must consider in crafting a sentence."); *Ramirez-Gutierrez*, 503 F.3d at 645-46 ("Harsh or unpleasant conditions of pretrial confinement are not among the § 3553(a) factors, and we have not decided whether such conditions could ever justify a reduced sentence."). Petitioner has not cited any cases in which the Seventh Circuit permitted a reduced sentence based on presentencing confinement conditions.

In his affidavit, petitioner alleges the following with regard to the "Don" jail: he was housed in a three (3) man cell for half of the time he was there, and had to sleep on a mattress on the floor for a quarter of that time; his rest was frequently interrupted by a flushing toilet (located in the cell) or other noise; he did not have access to the cell during the day to rest; he often had to sit on the floor to eat due to overcrowded facilities; there were inadequate restroom and washroom facilities; security was inadequate; and that he became the target of a number of extortion schemes, in which his safety was threatened if he refused to participate. Nowhere does petitioner state that he ever raised these issues with his Canadian counsel or with a Canadian Court to pursue any type of relief that may have been available to him via those avenues.

In petitioner's supporting memorandum, he cites as further evidence of the harsh

conditions a website that contains several articles that discuss the conditions at the "Don" jail. (Doc. 2 at 27-28). The website, however, includes: an undated article from the Toronto Star (which the Court could not find independently); an article supposedly from the National Union of Public and General Employees (which could not be found independently); a 2000 article from EYE weekly, a 2003 article from the Toronto Star (which does not describe the conditions of "Don" jail), and another article that lacks any reference to its source.

Conditions that have, in *other* circuits, been considered as mitigating circumstances that could justify a downward departure include: five out of six years spent in twenty-three (23) hour per day lockdown with no outdoor access whatsoever, and an eight (8) month detention in an unlit four-by-eight foot cell with three or four other inmates, no running water, no access to paper, pens, newspaper, or radio, and an allowance of only one phone call per week. *Ramirez-Gutierrez*, 503 F.3d at 646. By comparison to these conditions, petitioner's presentencing confinement conditions were certainly unpleasant, but do not appear to rise to the "extraordinary" conditions cited by the inmates in the Second and Eleventh Circuits whose circumstances justified a downward departure.

Although trial and appellate counsel *could* have raised petitioner's presentencing confinement argument, by no means were they ineffective for failing to do so. The Court must not second-guess counsel's strategy, but instead, view counsel's decisions deferentially. Counsel is not deemed ineffective for failing to raise every possible nonfrivolous argument. *See Strickland*, 466 U.S. at 689; *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013). Additionally, "[a]ppellate lawyers are not required to present every nonfrivolous claim on behalf of their clients—such a requirement would serve to bury strong arguments in weak ones—but they *are* expected to select the most promising issues for review." *Shaw*, 721 F.3d at 915 (internal quotation omitted). In light of Seventh Circuit precedent, it was entirely reasonable for both counsel to forgo this argument, and instead, for strategic purposes,

focus on those arguments with greater potential for success.

Trial and appellate counsel can not be found ineffective for failing to raise arguments that appeared weak in light of current precedent, in favor of stronger ones, especially in light of the fact that, in the Seventh Circuit, presentencing conditions have never been considered sentencing factors. Petitioner has not shown that trial or appellate counsel's assistance was objectively unreasonable. Accordingly, petitioner's claims, on this basis, are **DENIED**.

### E. FAILURE TO REQUEST A DOWNWARD VARIANCE IN SENTENCING BASED ON PETITIONER'S STATUS AS AN ALIEN

Petitioner claims that trial counsel failed to request a downward variance in sentencing based on petitioner's status as a deportable alien during oral arguments. However, petitioner acknowledges (Doc. 2 at 35) that trial counsel included this argument in her written sentencing memorandum (No. 04-CR-30111-WDS-3, Doc. 158 at 7-8). She also noted it in her objections to the PSR. (No. 04-CR-30111-WDS-3, Doc. 149 at 10). Petitioner is apparently arguing that her failure to argue this issue orally, at the sentencing hearing, resulted in ineffective assistance. Petitioner also claims that appellate counsel's performance was deficient for failing to raise, on appeal, the fact that the Court did not specifically address petitioner's alien status when explaining its sentence and discussing the § 3553 factors.

The government asserts that trial counsel did, in fact, argue that petitioner's alien status could be considered to grant him a downward departure, and that defendant's citizenship is not among the factors a court must consider under 18 U.S.C. §3553(a).

Upon review of the record, in counsel's objections to the PSR, counsel specifically argued that petitioner's status as a deportable alien subjects him to harsher confinement and more restrictions in prison. Counsel alerted the Court that petitioner would be ineligible for alcohol/substance abuse treatment, early release, and community confinement programs available to other prisoners (No. 04-CR-30111-WDS-3, Doc. 149 at 10). Counsel also cit-

ed caselaw which alerted the Court that it may consider the defendant's status as a deportable alien as a factor that might warrant departure. *Id.* Counsel raised this issue again in a sentencing memorandum (No. 04-CR-30111-WDS-3, Doc. 158 at 7-8).

The crux of petitioner's argument rests on his assertion that counsel's failure to bring the Court's attention to these arguments during the sentencing hearing amounted to ineffective assistance. The Court did not specifically refer to petitioner's citizenship status at the hearing, but it is obvious, from the record of the proceedings, that the Court reviewed counsel's objections and memorandum. (*See* No. 04-CR-30111-WDS-3, Doc. 183 at 3, the Court proposes to begin the hearing by going through the objections filed by the defendant; *id.* at 29-30, counsel noted that all of her primary PSR objections had been addressed in open Court with the exception of the objections to imposing a guidelines sentence (which is where the citizenship argument appeared); *id.* at 31, counsel noted that all of her objections are contained in the submissions to the Court; *id.* at 32, counsel again referred to her submissions to the Court regarding her arguments in mitigation, to which the Court responded, "Well, I meant any additional," indicating that it had reviewed each of counsel's written submissions; *id.* at 38, during counsel's arguments, she requests that the Court allow petitioner to serve his sentence close to the Canadian border so that he can have contact with people who can provide some support to him, and then, again, counsel refers the Court to her prior submissions.).

As noted by petitioner's counsel in her presentence written submissions, the Seventh Circuit Court of Appeals has determined that the district court *may* consider whether a defendant's "status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement." *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997); *accord United States v. Arowosaye*, 112 F.App'x 528, 532 (7th Cir. 2003). "However, *Farouil* contains no language that mandates sentencing courts to enter downward departures every time a defendant is a deportable alien." *United States v. Gallo-Vasquez*, 284 F.3d

780, 784 (7th Cir. 2002).

Although the Court did not explicitly discuss petitioner's status as an alien, the Court stated, at length, its explanation for its sentence, and specifically stated that it took into consideration all of the § 3553(a) factors, petitioner's age and physical condition, among other things. (No. 04-CR-30111-WDS-3, Doc. 183 at 53-57). "'[I]t is enough that the record confirms that the judge has given meaningful consideration to the section 3553(a) factors.'" *United States v. Brock*, 433 F.3d 931, 934 (7th Cir. 2006) (quoting *United States v. Williams*, 425 F.3d 478, 480 (7th Cir. 2005). Moreover, it appears from the record that the government did not dispute petitioner's counsel's arguments that petitioner's status as an alien and the resulting consequences could warrant a departure from the guidelines, thereby diminishing the need for oral argument on this specific topic at the sentencing hearing.

In light of the record showing that counsel raised petitioner's citizenship as a factor warranting departure in writing, on two occasions, and did not withdraw the argument at the sentencing hearing, counsel's failure to direct the Court's attention to this particular argument at the sentencing hearing does not amount to objectively unreasonable assistance. *See Swanson v. United States*, 692 F.3d 708, 717-18 (7th Cir. 2012) (counsel's failure to argue, at the sentencing hearing, an objection that was twice flagged by counsel in writing, did not result in the waiver or forfeiture of the objection, and did not amount to objectively deficient representation). The references made by counsel to the Court at petitioner's sentencing hearing show that the Court considered counsel's written submissions, and she was not required to make a separate argument orally in order to provide effective assistance. Petitioner's claim, on this basis, is **DENIED**.

In light of the fact that the Court considered petitioner's personal characteristics, even though it did not specifically discuss the citizenship factor, it was not unreasonable for petitioner's appellate counsel to forgo this argument on appeal for the sake of stronger ar-

guments.   Petitioner has not shown appellate counsel's assistance was objectively unreasonable.  Accordingly, petitioner's claim, on this basis, is **DENIED**.


### F.   FAILURE TO OBJECT TO THE COURT'S USE OF A VULNERABLE VICTIMS ENHANCEMENT

Petitioner claims that trial counsel failed to argue that the record was insufficient to show that petitioner knew, or should have known, that unusually vulnerable victims were being targeted.  Petitioner claims that, as a result, he suffered prejudice via the application of a vulnerable victims enhancement. Petitioner also argues that his appellate counsel failed to raise this issue on appeal, and failed to argue that the Court's explanation for vulnerable victims enhancement finding was insufficient.

Petitioner's trial counsel did, in fact, object to the use of the vulnerable victim adjustment, noting that the Commentary to the Sentencing Guidelines provided that consumers with credit problems may qualify as vulnerable victims, but are not *per se* unusually vulnerable. (No. 04-CR-30111-WDS-3, Doc. 149 at 4-5).

The government asserts, as it argued at petitioner's sentencing hearing, that pursuant to *United States. v. Grimes*, 173 F.3d 634 (7th Cir. 1999), the targeting of people who have credit problems amounts to targeting "vulnerable victims." The Court in *Grimes* noted:

> The "vulnerable victim" sentencing enhancement is intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal. Because criminals incur reduced risks and costs in victimizing such people, a higher than average punishment is necessary to deter the crimes against them. . . . . Defrauders who direct their activities not against banks, insurance companies, or large investors, but instead against people who because of mental or educational deficiencies or financial desperation are suckers for offers of easy money, do not need to take as many precautions against the discovery of their scheme by the intended victims and in any event are less likely to be prosecuted, because the victims are less likely to know that they have been defrauded or if they know to have the know-how and initiative required to press a criminal complaint or bring a

civil suit.

173 F.3d at 637 (internal citations omitted). In this case, customers of First Capital would pay a fee with the expectation of receiving a credit card, and trial testimony provided that the telemarketing scheme specifically targeted people with credit problems. According to the *Grimes* Court, "[o]nly a desperate person, unable to obtain credit by a normal route, would plunk down a nonrefundable $198 for the right just to apply for a loan. Such people are rightly regarded as unusually vulnerable. *Id*.

Despite *Grimes*, petitioner's counsel objected to the PSR on the grounds that petitioner was not on notice that the victims were unusually vulnerable, and that the record indicated that individuals who had declared bankruptcy were deemed ineligible to participate in the program (No. 04-CR-30111-WDS-3, Doc. 149 at 1). At the sentencing hearing, she also argued that, while at least one victim sought the credit card based on her child's medical condition, petitioner was not privy to the reasons that any of the victims were seeking a credit card, and that the government should not compare his case to one in which victims are persuaded by false representations about cancer treatment. (No. 04-CR-30111-WDS-3, Doc. 183 at 18-20). With these arguments, counsel specifically challenged the fact that petitioner knew or should have known that the victims were vulnerable.

Counsel also argued that the victims did not lose their life savings, but at most, $219 per credit card request, and therefore, an argument that the victims suffered emotional distress as a result of not receiving the credit card, was inappropriate. *Id*. Counsel further urged the Court to distinguish the victims in this case, who lost around $200, from those in cases in which the victims targeted were subject to foreclosure, or lost their pension funds, or sold medicine in the hopes of curing cancer. *Id*. at 21. Counsel also made various arguments in her written submissions and during the sentencing hearing, that petitioner was not fully aware of the scheme, was merely a financial backer and not an organizer or leader, and that, he was not as culpable as a result. All of these arguments challenge the applicability of

the vulnerable victims enhancement, and specifically, petitioner's knowledge with respect to the victims.

In light of counsel's arguments, petitioner has failed to show that counsel's assistance fell below an objective standard of reasonableness. Accordingly, petitioner's claim on this basis is **DENIED**.

Petitioner also argues that appellate counsel was deficient for failing to raise an argument on appeal that petitioner did not know, nor could he have known that victims were unusually vulnerable, or that the Court's explanation for applying the vulnerable victim enhancement was insufficient. At the sentencing hearing, the Court made specific findings that the evidence showed that specific customers were targeted, and those customers were found to be unable financially to obtain credit, specifically in the form of credit cards. (No. 04-CR-30111-WDS-3, Doc. 183 at 24).

The Court overruled counsel's objection, noting that, while not every targeted victim was suffering from an illness or injury, the scheme was

> designed to take advantage of a class of people for whatever reason were unable to obtain credit and who felt that they needed credit to continue their life, to support their families, to obtain the necessary food or clothing or housing or medical care, or for that matter, amusement, whatever they felt they needed, but it was designed to . . . take advantage of people who needed these funds and who were not obviously in most instances very careful about how they obtained their credit.

*Id.*

One of the issues raised on appeal by appellate counsel was that the evidence at trial was insufficient to show that petitioner "knowingly participated in a fraudulent scheme with the specific intent to deceive or cheat the scheme's victims." 580 F.3d at 645-46. Specifically, counsel contended that the evidence did not show that "he possessed either the knowledge or the intent necessary to be guilty of the charged crimes," that he lacked criminal intent, never read or discussed sales scripts, had only a passive role, was unaware of any fraudulent or illegal activity, and was merely a pawn. *Id.* at 646. The Court of Appeals de-

termined, however, that the "evidence presented at trial was sufficient to support the jury's verdict," and that the evidence was sufficient for a jury to conclude that petitioner "acted with knowledge of First Capital's fraudulent activity and with the specific intent to defraud First Capital's victims." *Id*. at 646-47.

It is clear, therefore, that appellate counsel challenged petitioner's knowledge and intent with respect to the victims, but did so in a manner that could potentially result in a reversal of his conviction instead of an argument regarding a sentencing enhancement. In light of the fact that petitioner received a below-guidelines sentence, and that appellate counsel believed petitioner had a potentially meritorious ground to challenge his conviction, petitioner has not shown that appellate counsel's assistance was objectively unreasonable. Accordingly, petitioner's claim, on this basis, is **DENIED**.

### G. Failure to Bring to the Court's Attention Several Mitigating Circumstances in Support of a Lesser Sentence

Finally, petitioner argues that his trial counsel performed deficiently during sentencing by failing to bring to the court's attention several mitigating circumstances in support of a lesser sentence. However, the Court notes that each example petitioner cites (including the misuse of *Demaree*, incorrect actual loss total, the egregious conditions of his confinement, his alien status, and the misapplication of the vulnerable victim enhancement) has already been discussed and denied above, and petitioner's claim, on this basis, is therefore, **DENIED**.

### III. Hearing

Petitioner has requested a hearing. Because summary dismissal of a § 2255 motion is appropriate when the motion and the files and records of the case conclusively demonstrate that the petitioner is not entitled to relief, this Court **FINDS** that it is not necessary to hold a hearing, and petitioner's request is **DENIED**. 28 U.S.C. § 2255(b), *see also, Politte v. United States*, 852 F.2d 924, 931 (7th Cir. 1988)

## IV. CERTIFICATE OF APPEALABILITY

Should Petitioner desire to appeal this Court's ruling dismissing his motion under 28 U.S.C. § 2255, he must first secure a certificate of appealability, either from this Court or from the Court of Appeals. *See* FED. R. APP. P. 22(b); 28 U.S.C. § 2253(c)(1). Pursuant to 28 U.S.C. § 2253, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."

This requirement has been interpreted by the Supreme Court to mean that an applicant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner need not show that his appeal will succeed, *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003), but petitioner must show "something more than the absence of frivolity" or the existence of mere "good faith" on his part. *Id.* at 338 (*quoting Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). If the district court denies the request, a petitioner may request that a circuit judge issue the certificate of appealability. FED. R. APP. P. 22(b)(1)-(3).

For the reasons detailed above, the Court has determined that petitioner has not stated any grounds for relief under § 2255. Furthermore, the Court finds no basis for a determination that its decision is debatable or incorrect. Thus, Petitioner has not made "a substantial showing of the denial of a constitutional right."

**IT IS THEREFORE ORDERED** that a certificate of appealability shall **NOT** be issued.

<u>**CONCLUSION**</u>

Petitioner's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C.

§ 2255 is **DENIED** on all grounds raised, and the petition is **DISMISSED WITH PREJ-**

**UDICE.**

A certificate of appealability shall **NOT** be issued.

The Clerk of the Court is **DIRECTED** to enter judgment accordingly.


**IT IS SO ORDERED.**

**DATED:** <u>**December 6, 2013**</u>


<u>**/s/ WILLIAM D. STIEHL**</u>
**DISTRICT JUDGE**
